We understand that the parties have agreed upon allocation of time for oral argument and I want to read it to make sure we're all on the same page. First, Mr. Clement will have 15 minutes, then Mr. Starr will have 15, then Mr. Clement will have 5 minutes, and Mr. Starr will have 5 minutes. Is that correct? I hope our machine is programmed to remind you of that. Thank you. Good morning, your honors, and may it please the court, Paul Clement for the defendants. While there are many issues on this appeal, the court need only decide a single straightforward issue to reverse in total. The Texas District Court lacked personal jurisdiction to try these California cases. Not only is that conclusion case dispositive and straightforward, it is compelled by this court's decision in In re DePuy. The panel there held that it was clear and indisputable error for the trial court to find a lexicon waiver and exercise jurisdiction over trials of out-of-state cases. As you might imagine, I have a few questions about the mandamus since I was on it, but let's back up a second on personal jurisdiction. In this case, which we're talking about the third bellwethers, what's before us now, right? Right, your honor. You raised personal jurisdiction and the District Court just analyzes personal jurisdiction under California context, which I think everyone agrees that was wrong now. It did not rest a finding of personal jurisdiction in this third bellwether case on any finding of waiver. This case goes to trial, and here we are with the only personal jurisdiction ruling in this case being the California context. It wasn't until the fourth bellwether, which is what the mandamus arose out of, that the District Court said, oh, but there's also a waiver, and that was what's at issue in the mandamus. So why is the waiver even an issue in this case, since that wasn't a basis for personal jurisdiction? Well, Judge Costa, I mean, we'd be happy to take this case on the idea that waiver isn't at all the only case we win, right? Because we've argued that the California context are not the right thing to be looking at, and I don't really see my friend on the other side as defending the judgment independent of waiver. So he'll have to speak to himself on this, but I think they have a theory that if there were a lexicon waiver, then at that point the right level of analysis is the California context and not the Texas context. But you're absolutely right that as to the personal jurisdiction ruling, there was no finding of waiver in this case at all. So why – and again, this may be a friendly point – why can't we just say the only basis for personal jurisdiction here found by the District Court was California context? That's erroneous. There was no – the trial's vacated. Your Honor, I'm going to have to sit down now. I mean, but – Well, I do have more questions. Let's move on to the mandamus, though. But can I just make one other point? Because I think in fairness to my friends on the other side, I mean it's even a little more complicated than that because before we moved to dismiss for personal jurisdiction, we did move to stay this third bellwether. And in the context of the stay, the District Court did make sort of essentially a waiver finding as to lexicon in the stay context. Subsequently, we moved to dismiss for lack of personal jurisdiction, and the judge not only doesn't rest on waiver but affirmatively says that he's not resting on waiver because my friends on the other side made a waiver argument, and he said, no, I'm not relying on waiver. I'm just relying on California. So I suppose that's one other way that my friends on the other side could try to inject the waiver issue, but I don't think that's right because that's a different motion. We're here on appeal with a personal jurisdiction ruling, which was clearly based on the California context. And just the last thing to say about this is, I mean, the fact that there wasn't a waiver holding in this particular sort of third bellwether does create a little bit of anomaly when it comes to the standard for appeal. Exactly. Right? It's normally abuse of discretion if there was never a binding. You know, I'd love to tell you that I actually think the right standard isn't abuse of discretion in this particular context. But even if in other cases the standard is abuse of discretion, it's got to be de novo here or something else because there's no finding to defer to and evaluate as to whether it's— Let's say waiver is part of this case. Sure. Let's say it is. And you're relying on the mandamus opinion. Is your view that the waiver discussion that Judge Smith and Judge Jones agreed on in that case, is it your view that that's not dicta or that it is dicta but it's nonetheless dicta can be binding? It is—well, ultimately it's both, but I'd like to—our principal position is that it's actually holding. And that's— How is it essential? The holding was you seek a mandamus saying stop this trial. It was going to happen in a week or so. You have to stop this trial, issue a writ of mandamus that stops this trial from going forward. The judgment denied that writ. So how is it essential, the holding, to say we think there was a waiver, there was not a waiver? And I think the answer is that those were two issues, each of which the other components that are—and obviously you were there, so you know this. But there are three essentially necessary findings that a court has to make to issue a mandamus. Now, the court decided, over your objection, to decide those three issues, every one of which is potentially outcome determinative in the order it addressed them. So when it was addressing the waiver and whether there was clear and indisputable error, if those two judges had come out the other way on that issue, that would have been outcome determinative in the case. And in that sense, the fact that they addressed that issue first and they came out the other way makes it a holding. And I think the clear analogy here that – because I understand sort of where the question comes from and where my friend's argument comes from. I always say alternative holdings are binding. So if you say plaintiff loses because it can't meet element one, and by the way, plaintiff also can't meet element three, those are both binding because they both support the actual ruling of the court. Here the waiver finding was going in a different direction than the judgment the court entered on. But I actually think because that issue was independently potentially outcome determinative, it is an alternative holding. And the analogy I would give you that at least helps me is qualified immunity context, where in that case, if this court rules for the officer on clearly established, but it decides and it now has the choice after Pearson to address the constitutional independent – the constitutional issue first. And it says, all right, in this case we think the police violated the constitution, but we don't think it was clearly established. So it's a ruling for the police officers. But that first issue is a holding, and the reason I think we know that to the kind of certainty that binds all of us is the Supreme Court camerata against Green. Green said that the police officer can appeal. Well, here the panel was honest that the projection of mandamus was that we can't grant – we shouldn't grant mandamus here because the party seeking mandamus has a right of appeal. And then under the arguments being made, but we're going to decide that right of appeal. We're going to decide the merits of that appeal also. So I see some tension in simultaneously saying that mandamus does not lie as an extraordinary writ because of the appellate rights you have, and then foreclosing those same appellate rights in that order. So Judge Hiddenbotham, obviously Judge Costa saw that same tension, and I think that might be a good reason for the mandamus panel to do what Judge Costa recommended that they do. But I think all of that is in the realm of discretion, and I think once the two judges in the majority did what they did and addressed those issues first, that would be – that is a holding. And I think the same analogy – The discretion – I'm not so sure that the panel has discretion to frame their ruling in a way that changes its bite, its context in which they rule. In other words, the question of whether it's dict or not is whether it's essential to the holding that's there. And so I don't know what – I don't see where the panel has a discretion to characterize it in a way that has bonding effect simultaneously saying that that's the reason that they're going to do it. So just to be as clear as I can be, I don't think the panel just gets to sort of make it a holding. But I do think they get to make it a holding by addressing an outcome-determinative issue first. That's not a gratuitous discussion. They made it. Well, absolutely. But if they had come out the other way, the case would have been over. And again, I think – Well, let me give you a hypothetical on this whole dicta discussion. You won the Christopher case a few months ago. There's going to be a new trial. There were a ton of issues raised, as in this case in the briefing. What if two or all three judges on that panel said we're granting a new trial, but we do want it. It's just more efficient this way. There's all these arguments about whether the damages are supported by the evidence. And we're just going to – even though we're wiping away the verdict, we're going to say they are. We think the evidence supported those verdicts. So if on remand there's another big verdict, that issue will be resolved. Would that be binding? I think the basic issue – the answer is yes. I think there might be reasons – but Judge Costa, I think there might be reasons why that isn't the kind of issue that that panel really could address that way because the evidence in the second trial is going to be different. But – If it were the same, you think that would – so judges can decide any issue, and if they decide it, it's binding. Yeah, I think that's right. As long as they're within their discretion to reach the issue. So if a court tries to – in a decision where a court says – How do you have discretion to reach the issue when you're denying mandamus the right of review? Because you have discretion as to which of the three mandamus factors you're going to address first. And when you definitively resolve them – and of course the panel uses the phrase holds. So the majority at least thought it was engaged in a holding. I think that's clear. But I think the reason that that holding is binding on this second panel is because those were outcome-determinative issues, and they had the discretion to address them. So, Judge Costa, I think it's different if a court says, no, I don't think we have jurisdiction here. So the consequence is – play out the consequences of that. So what follows from your position? Well, I think what follows from our position in this case is that the finding that the standard for review is clear and indisputable and that there was no lexicon waiver here, I think then – What follows from that is that a four-month trial and verdict are wiped out for warrant of jurisdiction, decided on mandamus. Well, two things. I mean – Is that right? You're right, Your Honor, and I think that – but don't blame us. I mean we've preserved all our objections in due course. And, of course, I do think – I mean just to get it on the table, I mean I do think, and I think this is consistent with what Judge Costa said in his concurring opinion, that I do think the fourth bellwether that, despite your rhetorical question, actually did go forward, I think that should be wiped out too. And just – So we have a situation where the mandamus is filed. It's not accepted, but the effect of the order is nonetheless to wipe out the entire trial. That is correct. And just – I wanted to – two more things before I move on to anything else. And they had the discretion to do that. They did. And if I could just say two things just to sort of complete this part of the discussion. So one of the things, just to Judge Costa's sort of – just to finish the colloquy on this, I think it's different if a court says, all right, ruling one, we don't have jurisdiction, but ruling two, we want to say some things about the merits. I don't think you get to do that because there's basically external law that tells you – But on that mandamus, it's almost an issue of jurisdiction. I mean maybe this is getting back to my dissent, but – or concurring in the judgment. But if – in mandamus, if there's a direct appeal that provides an adequate remedy, there's really no mandamus jurisdiction then. If that were the law, I would agree with you. Well, I think the Supreme Court does say that's the first issue to be decided, but that's been – But I think the panel decision must be at least finding precedent on that question. So if you know what I mean on whether you have to decide that issue. Well, let's talk about the underlying issue. How do you get around the December 2014 – I mean if it's binding, you win, right? So let's say it's not binding. How do you get around the December 2014, the special master asked defense counsel to confirm Dupuy is willing to waive lexicon for all MDL cases to be tried in Dallas? And counsel – your counsel says confirmed. In the context, you just won the big first trial. You're happy in Dallas. I mean that's the whole history of this thing, as I see it, having dealt with it extensively twice. But how do you get around that not being a broad waiver? So can I give you one case site before I answer that question? So I just think it would be helpful for the court. There's a trilogy of cases. We found these only after we filed our briefs, so I won't go into too much of them. But I know in your concurrence you said that essentially this whole situation was kind of unprecedented. And there is a situation in the Ninth Circuit, a series of cases called Van Dusen. And the last of them, the site is 830 F. 3rd, 893. And if you look at that, you can get all three of them. And what happened in that case was another one of these kind of weird cases where it goes up, the court says, on the first mandamus standard, decides a legal point, but says an appeal is an adequate remedy. It goes back down. The district court did something quite unusual, I think, which is said, well, I'm going to stick with my ruling, notwithstanding the panel decision, but I'm going to certify an interlocutory appeal. The interlocutory appeal went up to the Ninth Circuit and said it's law of the case. You lose. We already decided it. So I think that is analogous to this situation. So asking your question, so I think that you have to understand this in the context. And I know you're putting the context, well, we lost the first – or we won the first bellwether, so we're happy then. But one thing that indisputably happened after the first bellwether is that the court scrapped the plan for the first bellwether. And for single plaintiffs. Well, yeah, but the original plan was let's get eight cases and let's do four trials with single plaintiffs out of the eight. But it went to multiple plaintiffs, and I understand why you object to that. But so in the context, when you go to the second bellwether, which I think is the context in which you're pointing to the reference where you're suggesting there might be a waiver, the first thing to recognize there is the very fact that the district court or the special master is asking for a new waiver kind of underscores, after there's already been what you could say is a global waiver, because in the first set of eight we said, sure, in picking the eight for the bellwether, we're willing to waive sort of a lexicon objection to the cases that would be selected for the first bellwether. So in the context of the second bellwether, the very fact that the special master is asking again is powerful evidence that the parties understand that we're doing this sort of bellwether by bellwether. So in the context of the second bellwether, defense counsel says, sure, we'll waive our lexicon objection for purposes of selecting the cases for just the second bellwether. Bellwether cases, plural. Next round of bellwether cases. But the next round, as the way it was certainly understood by our client, by my colleagues, and I think by the special master, because why ask the second time? Because you've already gotten that same, sure, we'll waive lexicon for the cases in this sort of bellwethers, these bellwether cases. You already got that in the first tranche. The very fact that he's asking again sort of indicates that the parties understand we're doing this tranche by tranche. So for the second tranche, yeah, we want to get like the best set of cases we can. And so in order to get the best set of cases, we won't artificially constrain the universe of cases by saying, no, we're not going to waive our lexicon. If you thought that at the time they were still going to be single plaintiff cases, by saying bellwether cases, you necessarily contemplated that waiver extended to more than just the second trial. With respect, no. What we thought in both the first and the second and the first and second cases was we're willing because, again, the parties are trying the first step. These so-called waivers are happening before the cases are picked for the bellwethers. So we're just saying, look, to get to the universe that's going to eventually be paid. Right, the pool, which will eventually – in the first one it's easy. It's eventually going to get to eight. We're willing to open up the whole pool of extant cases so that the plaintiffs can pick their four and we can pick our four unconstrained. But certainly once we got to eight, the understanding was we weren't waiving our lexicon waivers for everything else, the other cases. And I think – just to put a fine point on this – I think the standard is clear and unambiguous waiver. And I don't think – if there was some misunderstanding here, I don't think that satisfies the standard. And I also think that if you're trying to sort of come up with a rule that makes sense for the system as a whole, it would be awful to sort of find waiver under these circumstances because what my clients were doing by sort of allowing the broadest possible pool of bellwethers is exactly what you want defendants to do. But if you essentially put them to a choice where if – in trying to get the best possible pools of bellwethers, if they waive lexicon for those purposes, then all of a sudden it's a global waiver and there's going to be 9,300 trials in Dallas. I mean that's not – I swear on any stack of Bibles you want that that's not what we intended. And I don't think – Most defense lawyers before these verdicts came in would have rather been in the northern district of Texas than out in California or probably in New York. I mean this is viewed as a – it's not a plaintiff's – generally viewed as a plaintiff's haven. I understand that, Your Honor, but when you're in a context like this, I don't really think you want the 9,300 cases anywhere if you're a defendant. And in all events, I think the waiver rule you're going to set up here is going to have consequences. And I just think in general, in selecting bellwethers, you want defendants to say, yeah, let's get one from California, let's get one from Maine, and let's do them here, let's do the bellwether trials here because that's what's going to make sense. But if the cost of that is either generally or if you're not super specific that you've waived lexicon for everything, I don't think defendants are going to waive lexicon for purposes of getting you the best possible set of bellwethers. And I think that would be a result that you want to avoid. So I see I'm already over my time. There's a lot of other issues, and I'm happy to address them if there are questions. Thank you, sir. Mr. Starr. Thank you, and may it please the court. We want to talk about two different issues here. My brother is talking about lexicon waiver, 1407. We're actually here to talk about personal jurisdiction. That is what is before this court. And there's a very different standard. Under Settle Law, we refer the court, among other things, to Payne-Webber. If you have an objection to personal jurisdiction, you must make a continuing objection. And we'd urge the court to go to the record, beginning with the so-called amendment. Is that an MDL case, though? Because MDLs, there's no personal jurisdiction issue with all the pretrial proceedings. So it seems like a very different context. It may be a different context, but the principle remains the same. You're supposed to say, Judge, stop. We're not properly here. They did not do this in the third trial. In all these thousands of cases, even though for years you are going to be litigating pretrial matters before the MDL judge? You are there for a pretrial, but with the original understanding that we think is very clear by the reading of this record that there were going to be four Bellwether trials. Judge Kincaid concluded that. With respect, however, again, I would come to jurisdiction. If you don't believe that the court, that this is very subtle law, but we refer the court again to Payne-Webber, you must stand up and say we have, in the words of Payne-Webber, a continuing objection. They didn't do this. And this is why our principle submission today is litigation conduct constituted a waiver. And if I may take just 30 seconds to take the court through, here are the key events that will demonstrate, I think, beyond any doubt whatsoever, that by their litigation conduct, they wait. The first is on April 10, the Aoki, we call it Aoki, the Christopher verdict comes down on St. Patrick's Day, March 17, 2016. In April, their lead strategic counsel sends an email to Judge Stanton, who, by the way, very experienced, second set of eyes, his understanding and Judge Kincaid's understanding is we're going to have four Bellwether trials. So Judge Stanton receives an email that says let's postpone the third Bellwether trial until the Fifth Circuit has ruled on the merits. That's followed in quick order by motion for stay. Then a petition, well, that's pending, a petition, as you know, to this court for a writ of mandamus. All I have to do is let's wait. We want a rest stop, not one word on personal jurisdiction. Maybe you're right that all this constitutes waiver by litigation conduct, but Judge Kincaid never found that. So that's something that litigation or waiver by litigation conduct is something for the trial judge to decide. How can we decide that in the first instance? Jurisdiction is such a foundational element that it's de novo review. So you can, on this point, affirm on the basis of a different analysis. And we have presented to the court what we think is absolutely clear-cut, if I may go on. I mean jurisdiction is a matter of de novo review, but this is a – the question is waiver of jurisdiction. That is the fourth trial. Review their brief. They're trying to say the panel, three opinions and mandamus, somehow decided everything for this entire litigation. That seems too extravagant, as Chief Justice Marshall would say and did say, too extravagant, serious, and to be maintained. The administration of justice cannot operate with this kind of – and I'm just going to go ahead and put it. They sandbagged Judge Kincaid. Judge Kincaid has been operating on this assumption, and they're parsing, as Mr. Clement has very ably done, parsing these cases and so forth. We defer to your concurring opinion with respect to it, but here's another important – we have a different record in this case. Yes, there's overlap because it's a continuum of four bellwether cases, but the different record in this case makes it abundantly clear. They knew they were in Dallas. They wanted to remain in Dallas, but they only wanted a single plaintiff trial. So that's a question under 42A, which we haven't talked about. Let me stay on jurisdiction. You today have the authority to look afresh at the entire record, but especially in the post-Aoki verdict record. And now I want to prove the sandbagging. This was hiding behind the law. Look at the transcript of the special master's status conference. By the way, he had status conferences every Monday. What are your issues? You read those transcripts and you say, Judge Stanton has – what are your issues? That was before us in the mandamus. I mean, that all was. I mean, it seems to me the record's worse for you here because there's no finding of waiver in these cases. No, no, Your Honor. I respectfully disagree. Where was the finding of waiver in these cases before us? You do not have a waiver, but you've got de novo. I understand your point. My point is this is a different set of plaintiffs. These issues were not, in fact, litigated. What we're hearing now, lexicon waiver is now southerly. The only thing he can point to is footnote one in their motion for stay. That's it. But it doesn't say stop. We don't agree to personal jurisdiction. And that's what they had to do. They can't just then find a panel saying, well, let's interpret 1407, which is venue for MDL, with now we know. This circuit says we like the Seventh Circuit's approach, clear and unambiguous waiver. Your Honor, Judge Smith's controlling opinion does not talk about jurisdiction. Judge Smith – I'm sorry, Judge Smith's opinion does not. Judge Jones somewhat, if I may say so, with all respect, conflates the two, but that brings us back to what is the law? Why should there be a greater burden for a venue waiver than for personal jurisdiction? Because of the values in 1407, and you point to those values of concern about centralization. But personal jurisdiction is a constitutional concern under the due process. That's not a centralization. So is venue. Well, of course, but 1407 – the only reason that 1407 – and I believe a fair reading, indeed a generous, just a textual reading of the controlling opinion in Mandamus, which is a different case with a different record, and I'm going to come back to that, in the special master's report, shows that 1407 is essentially a very huge and important policy-wise exception to federal court jurisdiction. And therefore, there is a heavy presumption – I may be slightly overstating, but not much – but Judge Smith said, I have a presumption that 1407 MVL proceedings should only be used for pretrial. That's it. So you need to – and that would then fit into a whole body of jurisprudence, penhurst, all kinds of values, with respect to you need a clear and unambiguous waiver. That's what the Seventh Circuit said. That's now imported in the Mandamus opinion into the law of this circuit. I think that's all that was held, 1407. We're talking about jurisdiction. So I want to bring the court back to that status conference on July 25th. If the court will review that status conference four days before they file the motion to dismiss for lack of jurisdiction, they will see – this is the top – page nine of our brief, of our response and reply brief. They were asked by Judge Stanton ten times, is there anything else? And they were all moving toward trial. In fact, you'll see – and this is all new – this was not before the Mandamus panel at all. It wasn't relevant. We were talking about lexicon waiver. This is jurisdiction. They know how to review. You can look at the record afresh. And I believe that this court will conclude after reading that couple with what they said to this court in the petition for writ of Mandamus. The court took it very seriously, as it always does. This court called for a response. We responded. They replied. Not one word on jurisdiction. We are getting ready for trial. Talk about detrimental reliance. The administration of justice does not work that way. Now – Let me ask you about another issue in the administration of justice, the evidentiary rulings, the 404B in particular, the deferred prosecution agreement, which the defendant entered into because they were paying money for doctors to use their product. What was the relevance of that to this case? Completely relevant, and this showed exactly how they went about marketing their product. They marketed their product by paying money to doctors, not just to design surgeons, and it was relevant because two of our treating physicians received payments from them. But it spoke more broadly to this is the way that Pew, Johnson & Johnson does business. This is what they read, and by the way, it's highly relevant. We embrace it because – and I want to come to punitive damages. I know you allege that the defendant was paying doctors to promote the use of the metal on metal, but that's – the deferred prosecution agreement was just about paying them for using it, not for promoting it, right? Your Honor, look at exactly what, in fact, they introduced. So we also have a waiver argument. Speaking of waiver, they introduced the deferred prosecution agreement. Look at page one. This is a great company of the DPA. Then look at the first monitor's report and then her final monitor's report, page six. They affirmatively introduced that. After their objection was overruled. Six weeks later, Your Honor. But their objection had been overruled first. Yes, on relevancy grounds. We think that is a discretionary call. These are trial judges making discretionary calls. And by the way, Your Honor, juxtapose that to this court's decision condemning the introduction of the Foreign Corrupt Practices DPA. They won on that, and Judge Kincaid's court in a motion eliminated it. And if I may step back just for a second, this is a trial and error process in this very complex litigation. We learn from each trial. That's one of the reasons there are multiple plaintiff trials. They say there was an agreement for single – we never agreed to that. That is a representation that I will dispute. Let's have an evidentiary hearing. Send it to a special master. Let's put people on the stand and say, was there, in fact, agreement? The short answer is we wanted multiple plaintiffs. They wanted single plaintiffs. The judge took it a step at a time. And the reason that he moves to multiple plaintiffs is Paoli, the first case, the Montana, by the way. Why are we litigating California context? That's what they did in the Montana case. The entire record of this case shows a sensitivity to our federal system and the analysis of the appropriate legal issues state by state. That's precisely what they did in Montana. And it comes with ill grace for them to say, oh, why is Judge Kincaid focusing on California law? Because of the nature of the MDL process and what Judge Kincaid, guided by Judge Stanton, on top of this case says we have consent. Not to 9,000 cases. That's preposterous. And it has never been anyone's contemplation that Judge Kincaid would lay claim to trying 9,000 cases. On its face, preposterous. What is not? What was the limit on the waiver? The limit on the waiver was for the four Bellwether cases. As many plaintiffs as those were going to be packed into the Bellwether. Your Honor, then it would be a 42A abuse of discretion analysis. But you see, he calibrated it. He didn't go, there's a trial underway right now saying there's 22 plaintiffs. No. He had six plaintiffs and spouses. Perfectly reasonable, and we would guide the court to your sister, your sibling circuit's decision in Igniam, the 11th circuit, which in a very similar setting, by the way, one of the reasons it said no abuse of discretion, that was for plaintiffs. And Boston Scientifics made exactly the same arguments. They all make the same arguments. Oh, you can only have one plaintiff. Judge Marcus's opinion dispatches that. He was a district judge before he became a court of appeals judge. The experienced district judges know. They have discretion under 42A, and so they're going to calibrate and not load. If we were here with 22 plaintiffs, Your Honor, I would have a tough sledding on 42A. But this court, the guidance that you've given to district courts, Your Honors, is use 42A and imagine this is a two-month trial. Why don't we have 9,000 around the country, two-month trials? It is preposterous, and especially since the plaintiff population – I'm not making a jury argument. The plaintiff population is typically aging. Those are our plaintiffs. They're a bit older. And if I may say just a word to open the door for my punitive damages rebuttal, which we didn't get to, but I do want to speak to punitive damages. The record in this case that they don't even contest it. Reprehensibility is extraordinarily high. And when I return with the court's indulgence, I would like to speak to that issue as well as answer any questions the court may have. I thank you for your indulgence. So just a few points in rebuttal. First of all, there's this discussion that we agreed to four bellwether trials with, I suppose, the idea that, as Your Honor put it, anything you cram into those. That's not right. What we agreed to was the first set of bellwethers, there were going to be four trials out of eight. The parties were going to pick eight cases, four and four. The judge was going to pick four cases. He was going to do individual trials. That was the original plan. And after the first bellwether trial, that plan scrapped. And the most powerful evidence of that was scrapped. I mean it was scrapped. I don't think there's any dispute about that. And that's why the special master had to ask for the second bellwether for another lexicon waiver. And it was that process of getting the cases for the universe for the second one that we waived it. We did not waive to an undisclosed third set or a fourth set. And there's no magic to four. I mean Judge Kincaid has now said he's not going to do more than four, but you can't link up his voluntary decision to say he's only going to do this four times. With our initial agreement to do four out of eight. Those are just two very different things. And the first agreement to do four out of eight was scrapped not by us. We would have been happy to keep doing those, but it was scrapped by Judge Kincaid. So the four is something that you should not sort of get distracted by. I also don't think you should get distracted by this discussion of the July 25th status conference for ten times. We were asked if we had any problems, and we didn't say anything. Just to put that in context, our stay motion was denied 20 days before that on July 5th. And it was denied on the grounds that there had been a lexicon waiver. Sort of the same basic grounds that were picked up in the fourth Bellwether jurisdictional ruling. So we'd already been told by the time that that status conference comes around that Judge Kincaid thought there was a lexicon waiver. So we can't be faulted for not saying, well, we know you've already ruled against us on this once, but just so you know, just for the record. The second thing you can't possibly do, and I know Judge Costa, one of your questions sort of suggested this. But you can't apply sort of normal sort of litigation conduct, personal jurisdiction waiver principles to an MDL. Because my friends on the other side, their first big piece of litigation conduct is this continuance motion. That's a couple of days before a motion to dismiss. Now I don't think that gets it done for all sorts of reasons, including the federal rules are pretty clear that you only waive that sort of thing by not including it in a motion to dismiss or your answer. And we preserved it for those purposes. But then the second thing they point to in their brief is litigation conduct that waived our personal jurisdiction objection is all the discovery that took place. Of course there was discovery. It's an MDL. That's what's supposed to take place. So maybe you could have a case like the Carbon case that they point to where it is an MDL and the parties have multiple – the defendants have said multiple times in the context of the particular trial, the single plaintiff trial that's going to trial. They've been saying they're going to do the trial, and then on the eve of trial they say, now we're pulling it out. Maybe that's a different case, but you just can't have sort of normal sort of Penn Weber litigation conduct principles applying in an MDL. It's got to be clear and unambiguous, and it's just not here. I mean if you put aside a second for one minute the exact status of the majority mandamus opinion. I mean if the question is clear and unambiguous, the fact that two of your colleagues could say that it was – that not only was there no waiver here, but it's indisputable that there was no waiver here. I mean even if that's not binding, it sure does put it at least in the realm of ambiguity for purposes of not being able to find a waiver. Well, I must tell you, it's no stranger to MDL litigation. I find it absolutely stunning that you go to trial of this magnitude and that sort of liability with the question of the basic jurisdiction of the court unclear. I start from that in terms of management of these cases. I guess that's where we are. But nonetheless, that to me is every lawyer in this business knows exactly that this is just kind of operating one book law. No one has – this is not subtle. We've been doing this for years in 1407. And the question of – to go to trial, Judge Kincaid is no stranger to this. Any of the MDLS and the judges are up to speed on the basic primer rules. Somewhere along the line, this really got off the track. And that makes it very difficult for me as I read through these materials. Well, we're certainly in full agreement that this got way off the track, Your Honor. Oh, yeah. But the influence of that is I find it stunning that you have a right to consent to reject this case going forward. And you – it doesn't get nailed down. And if you made it clear that there was no objection to this, I mean, that you did object to it, that we're not consenting to this, then if that were clear, then – in other words, I'm saying to you that the question of clarity, I agree with you that from at least on the 1407 point that the Executive Waiver must be clear. On the Seventh Circuit, it has to be right about that. But that's also such a strong directive to the litigants themselves and to the trial judge. But that argues in favor of – suggests that if you don't make it clear and you participate in the trial, then as an inference, they're a waiver. You say, well, inference is not enough. Of course, I understand that. But I'm just – No, but I would say it more – But I'm just – that's my frustration with the case. I don't recall ever seeing such a thing arising like this. And, Your Honor, my clients are as frustrated with this case as they could be. Well, more so than I am, I'm sure. You're right. And so I would just like to try to make the point that I don't really think that your frustration is directed at us because we could not have made it more clear. I don't think that for the purposes of the third bellwether and the fourth bellwether, our position was there's no lexicon waiver for this. We want no part of this. There's no lexicon waiver. And we were told, no, we'd waive that. And we were – and I don't think there was a – I don't think there was any waiver, but I certainly don't think there was a clear and unambiguous waiver. But once we've been told that, like what are we to do? We tried to maintain this. A lot of trial lawyers have got to do is get on his feet and say I object. Well, we did. When? Certainly well before the third bellwether started. And so unless you're going to construe those earlier waivers as being sort of global waivers in some way, which they're not, they were for that tranche of bellwether cases. And we did everything we could to make clear that this particular case, that you didn't waive. Or beyond that. I'm sorry. I know your earlier waiver doesn't extend to this. We certainly don't think so. If I could just maybe say two things before I sit down. One is my friend Mr. Starr said it would be preposterous to say that the waiver extended to all 9,300 cases. I mean when I read the transcript of the oral argument in the Mandamus hearing, I thought that's what he said was the best reading of Judge Kincaid's order, that it did extend globally to 9,300 cases, and that's what he meant. So I don't think it's preposterous. I think it just underscores how much ambiguity there is. Because if it wasn't a global waiver for all 9,300 for trials, then it really prompts the question, well, exactly what was it a waiver for? And as you say, it certainly wasn't a clear and unambiguous waiver. It could be a waiver of all 9,300 to be selected for the – among those to be selected for the bellwether. Yes. Sure. They were all eligible for the bellwether. One tranche at a time. I understand that. Well, that's what a bell – I think that's to color what the Mandamus discussion may have been about, as being eligible for the mandamus. Exactly. Wait, wait, wait. Waiver of what? The very definition of bellwether is we're going to select something that will give us a gun to avoid all the other trials. The notion that you're going to waive a bellwether for all of them, that doesn't make sense. Well, but I think in fairness what we waived was the possibility of any of those 9,300 being selected for the particular bellwethers that were under consideration, first eight and four, then the second, and then when it came to the third, we're like we're not waiving anything. And the only argument here is that somehow the waiver in the first two was so clear and unambiguous that it carried over to the third and the fourth, and as Judge Costa intimated, we did not at any point waive anything you want to cram into what you're going to call the third and fourth tranches of bellwether cases. We never waived that. We would not have waived that. And not only is it unfair to us to make that inference, but it would be counterproductive because you want defendants to waive the universe for purposes of any of the possible bellwethers. On the first trial, the outlier that Judge Kincaid found in which the defendants won, what does the record show with regard to the actual papering or the effort to make clear the waiver, Lascon waiver in that case? You all participate in it. Is it some formal statement or some recitation of an order or what? Or they just went forward and did it? I think it was, you know, back and forth with the special master based on, again, and based on a case-managing order that was specific to those university cases. You went back and forth and you went forward with trial. What I'm saying to you is suppose that that outlier had gone the other way big time, and then we went back to the record and said where in this record is there a waiver? And here's what would have happened is if we would have tried to say no waiver for the other three individual trials out of the universe of the remaining seven of eight cases, I think we would have waived it. We would have waived it based on our representations that measured up to the terms of case-management order one and case-management order eight, which were limited to that universe of cases. But that was thrown out, and that's why we needed a new waiver and why the special master got a new waiver for the second trial case. It was even more complicated because Johnson & Johnson in all these cases was contesting personal jurisdiction. I mean Christopher addresses that. Right. There's Texas contacts in Christopher for Johnson & Johnson as the defendant. So Johnson & Johnson was always objecting even despite the lexicon waiver for Bellwethers. They were always asserting personal jurisdiction as a defense. Yes. But, you know, and I think you can do that. I mean I think you can preserve that personal jurisdiction argument but essentially do a lexicon waiver as the venue to preserve that argument. I would only say, though, you know, we never tried to make this argument naivete. I mean, you know, so we think there is a material difference between these two, and, you know, I have other things I could say, but I don't want to overstay my welcome. So thank you, Ron. Thank you, sir. Thank you, Your Honor. Under agreement of counsel, my comments go to punitive damages. I do have to say that the litigation conduct that we talk about was preparing the cases for trial. That's the relevance of that July 25 special master report. We were on a fast moving train on punitive damages. Your Honor, as you know, this was an eight-week trial. It was hotly contested. The defendants sought vigorously to defend, but they lost. And the reason they lost is the evidence of liability was overwhelming. And then the evidence with respect to punitive damages was overwhelming. I'd like to guide the court to several specific citations in the record, which will give the court a flavor of how reprehensible the conduct was, which is the primary, not sole, focus of punitive damages. There's some competing concerns, though, because, sure, the more reprehensible it is, maybe the more you get a punitive damage award being supported. But also when you have a really big compensatory amount, the case law suggests the ratio shouldn't be as high because you've already gotten so much in compensatories, which is the case here. The compensatories are massive. So how do you reconcile that? We would say not massive compared to what we've seen in other verdicts around the country. They are having a lack of success in defending the integrity of their product, but even more importantly and relevantly for this, the integrity of their conduct. We begin with Plaintiff's Exhibit 1. Plaintiff's Exhibit 1 is the endgame memo where their own person in England says, in the lead says, the results could be, reintroduced in level on level, catastrophic. Look at the testimony of one of our treating physicians, Dr. Walter Huddleston, who they paid. He was one of the many people they paid. And when you think about punitive damages, the jury's original award, and we think of Seventh Amendment values, the moral conscience of the community, we think about the debate that's been underway in the Supreme Court about the legitimacy in the first place constitutionally and jurisprudentially about the interference with our Seventh Amendment process by saying we're going to bring an antitrust analysis. This is, I understand, binding law, except the court has, the Supreme Court has clarified that TXO brought the ratio up from 3 to 1 to 9 to 1 or 10 to 1, but they say there's lots of caveat language. And the Supreme Court has been dealing with BMWs that get repainted, fraud in the TXO situation, State Farm insurance adjusting problems. We're talking about personal injury. Read Dr. Huddleston's testimony. That is found at Trial Transcript, Volume 21. I can submit, but it's in our brief. He says, very respected orthopedic surgeon, I was seduced. He used that word. That's what one of their undesigned surgeons said. What were the extent of the injuries? I know these plaintiffs had to have the surgery to get it fixed, basically replaced, but what's been the extent of the injury? I haven't seen much of any injury really after that. You're reading their brief too carefully. Tell me what I should be reading. What you should be reading, Your Honor, with all due respect, are all of the references to the Trial Transcript which are in our brief. For each single plaintiff, it is very impressive. I'll take Dr. Huddleston. Dr. Huddleston saying when Michael Weiser, his patient, he was in such severe pain that he had him just going to be blood. This is his testimony. Crawled to the bathroom. Before or after it was fixed, though? No, before. Right. I'm saying what lingering injury? No, I saw that. I know there were injuries before that continue to this day. What are the injuries? We also submitted—this is an elaborately briefed post-trial. Judge Kincaid had it all before him. We had a chart, volume transcript, eight-week trial. Every single one testified to the impairment, some worse, some less. They would just say, oh, they can walk, they can play golf. Read the 31-volume transcript. This is a busy court. But if they're going to say, please interfere with a considered judgment of the jury, and we know this is a quintessential jury question, pain and suffering, how do you quantify that? I'm surprised it wasn't ordered arbitration. You're surprised by it? I'm sorry. Sometimes I'm surprised that these cases don't go to arbitration like everything else. Well, we— I'm sorry. That's just one of my frustrations. I don't blame the court for wondering why these cases don't get resolved, could not agree more. Could I just—my time has expired. Would the court indulge me to continue with the red light meeting? I think we've allowed both sides a little bit more. Within reason. Within reason. I will. The last thing standing between you and the conference. Dr. Nargol's trial testimony. May I give you that? Read his six and seven. This goes, again, to reprehensibility. The reprehensibility is put in sharp relief by Dr. Nargol, who they paid. He was one of their, quote, design surgeons in the U.K. So I took him up and was looking at his watch. No, I was just trying to see how much time you had left. As they say in South Pacific, I get the picture. Dr. Nargol—I will end with this, Your Honor. You've been very intelligent with counsel. Dr. Nargol blows the whistle, saying, I'm having terrible results, and the results are catastrophic. Volume six and seven. And the upshot was the folks from Warsaw, Indiana, the all-American city, show up and say, it's your fault. That was their strategy. It's all in the record. Blame the doctors. Then blame the patients. Then do what? Eventually run for the hills. Soft landing. They knew early on when the reports started coming in about the catastrophic results of this, and they continued to market anyway, even after their on-design surgeons reached the testimony of Tom Schmalzried. When did you stop? You were paid $30 million by DePue? $30 million? Look at his presentation to the salespersons. This is all before the jury. I'm not making a jury argument. I'm defending what the jury did, and that $84 million was $120 million less than they paid their design surgeons. I thank the Court. Thank you. Thank you. This case taken, and all the other cases argued this week, are taken under duress.